669 So.2d 1316 (1996)
Dorothy and Mark MORRIS
v.
Gregory FERRISS, M.D., Richard L. Corales, M.D., et al.
In re MEDICAL REVIEW PANEL.
In the Matter of MORRIS
v.
Gregory M. FERRISS, M.D., et al.
Dorothy and Mark MORRIS
v.
Gregory FERRISS, M.D., Richard L. Corales, M.D., et al.
Nos. 95-CA-1790 thru 95-CA-1792.
Court of Appeal of Louisiana, Fourth Circuit.
February 15, 1996.
Writ Denied April 26, 1996.
*1318 L. Kevin Coleman, New Orleans, for plaintiff.
Edward J. Rice, Jr., Cristina R. Wheat, Adams and Reese, New Orleans, for Richard L. Corales, M.D.
James L. Trinchard, David P. Curlin, Pamela Pucheu Reynoir, Trinchard & Trinchard, New Orleans, for Gregory Ferriss, M.D.
Before SCHOTT, C.J., and LOBRANO and JONES, JJ.
LOBRANO, Judge.
Plaintiff, Dorothy Morris, appeals a trial court judgment which dismissed her claims of malpractice against Drs. Gregory Ferriss and Richard Corales.[1] The issue for our resolution is to determine whether that judgment is clearly wrong or manifestly erroneous.
After review of the entire record, and applying the principles of appellate review, we affirm the judgment. Arguably, the evidence could have resulted in an equally reasonable contrary conclusion. However, we cannot say that the one reached by the trial judge is so wrong as to warrant a reversal. See, Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991).
After suffering the majority of her life from seizures and having no success with anti-convulsant medications, plaintiff, in March of 1986 sought treatment from Dr. Gulick, a neurologist. Dr. Gulick treated plaintiff for approximately one year[2] and basically concluded that she suffered partial complex seizures[3] that could not be controlled by medication. Dr. Gulick referred her to Dr. Ferriss, also a neurologist, for further treatment.
On May 7, 1987, Dr. Ferriss admitted plaintiff to Tulane Medical Center for evaluation in the epilepsy clinic and monitoring unit. The purpose of that treatment program was to observe and video record her seizures, and monitor EEG responses during seizure. Plaintiff was monitored for ten days during which she suffered at least five seizures or episodes of seizure-like behavior. The monitoring results are discussed in detail later in this opinion. An integral part of plaintiff's case, however, revolves around Dr. Ferriss' admit diagnosis, which was complex partial seizures secondary to brain damage in the neonatal or early childhood period. He also noted considerable psychological overlay and the possibility that many of the patient's episodes were psychogenic seizures rather than true organic seizures. Dr. Ferriss consulted with Dr. Phillip Griffin, a psychologist at Tulane. Dr. Griffin scored the results of an MMPI test that had been administered to plaintiff as part of her psychological workup. However Dr. Griffin's report never reached Dr. Ferriss prior to surgery.
Plaintiff, on May 18, 1987, was transferred to Southern Baptist Hospital for further evaluation *1319 and possible surgery by Dr. Corales, a neurosurgeon. At Southern Baptist, an MRI test confirmed that plaintiff had a lesion on the left temporal lobe of her brain which, according to the testimony, was consistent with the previous evaluations of epileptic (organic) seizures. It was also confirmed that the left side of plaintiff's brain was the dominant side, the same side to be operated on. Dr. Corales, relying on Dr. Ferriss' evaluations and diagnosis, as well as the MRI results, confirmed that plaintiff was a good candidate for surgery. On May 21, 1987, Dr. Corales removed the lesion.
When plaintiff recovered from surgery, she could not move her right side nor could she speak. After many months of rehabilitation, she has regained some of her speaking ability, however her right hand and arm are useless.
It is undisputed that plaintiff's condition is one of the risks associated with the surgical procedure she underwent. It is also undisputed that Dr. Corales informed plaintiff of those possible consequences prior to surgery. In addition, plaintiff does not complain that Dr. Corales committed malpractice while performing the surgery. Instead, plaintiff's complaint is that Dr. Ferriss did not heed his own admit diagnosis for psychological testing to determine whether plaintiff suffered psychogenic seizures,[4] nor did he consult with Dr. Griffin on the results of his MMPI tests prior to performing surgery, which plaintiff contends had numerous "red flags" suggesting further psychological testing. Plaintiff further argues that both Drs. Ferriss and Corales should have informed her prior to surgery that there was a possibility that she was suffering from psychogenic seizures, and that an alternative to surgery would have been to treat the psychogenic seizures first, and then see if the medication would control the organic (epileptic) seizures. Because the surgery is a last resort and is irreversible, plaintiff argues she should have been informed of the possibility of an alternative.
Dr. Corales argues that he relied on Dr. Ferriss' workup and evaluations, as well as the MRI, which were all consistent with the diagnosis of epileptic seizures caused by the lesion on the brain. He asserts that he breached no standard of care, and that all of the experts agree his reliance on Dr. Ferriss' evaluations was consistent with the medical practice in the community. In particular, he asserts that in cases of this type, where the diagnosis is intractable seizures, the workup and evaluation is the responsibility of the neurologist, not the neurosurgeon.
Dr. Ferriss argues that the evidence is undisputed that plaintiff suffered epileptic seizures and that her history, evaluations, and MRI results all indicated that surgery was necessary. He further asserts that the evidence is inconclusive of psychogenic seizures, and offers the testimony of various experts to support his assertion that performing surgery to remove the lesion was a correct procedure even assuming plaintiff also suffered psychogenic seizures. His response to plaintiff's argument is that psychological treatment would not be responsive if the cause of the epileptic seizures (i.e. the brain lesion) was not removed first.
Following trial, the trial judge found that plaintiff failed to carry her burden of proving that Drs. Ferriss and Corales either lacked the degree of knowledge or skill required or that they failed to use reasonable care and diligence along with their best judgment in the application of that skill.[5] The trial judge also found that Drs. Ferriss and Corales fully informed plaintiff of all of the risks of the treatment and surgery and obtained her informed consent.
Our Supreme Court, in Martin v. East Jefferson General Hospital, supra, at 1276-1277, set the burden of proof and standard of appellate review in this type of medical malpractice case as follows:
"In a medical malpractice action against a physician, the plaintiff carries a two-fold *1320 burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Smith v. State through DHHR, 523 So.2d 815, 819 (La.1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La.1986). Resolution of each of these inquiries are determinations of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La.1991); Smith, 523 So.2d at 822; Rosell v. ESCO, 549 So.2d 840 (La.1989); Hastings, 498 So.2d at 720.
* * * * * *
We have instructed the appellate courts that where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d at 844; Housley, supra."
We apply the above principles to the evidence presented at trial, which we now review.

TESTIMONY

Dr. Gregory Ferriss
Dr. Gregory Ferriss, a defendant in this case, is a neurologist who specializes in the treatment of seizure disorders. Dr. Ferriss first saw plaintiff on May 7, 1987 on referral from Dr. Thomas Gulick from Monroe, Louisiana. Dr. Gulick had treated plaintiff for approximately one year and had referred her to Dr. Ferriss because he found plaintiff suffered from epileptic seizures which were intractable, i.e. not controllable by medication.
At the first visit, Dr. Ferriss obtained plaintiff's history and decided to admit her to Tulane Medical Center. His admit diagnosis was complex partial seizures which were probably secondary to brain damage suffered in the neonatal or early childhood period. The diagnosis of probable brain damage was based on plaintiff's history that she had convulsions at age three months and seizures subsequently through childhood and adulthood. Dr. Ferriss felt that the early childhood convulsion episode was probably the point at which she acquired an epileptic brain lesion.
As a differential admit diagnosis, Dr. Ferriss also noted the possibility that plaintiff's episodes of seizure-like behavior could be psychogenic seizures. Dr. Ferriss based this initial opinion on the plaintiff's psychosocial history related to him by her which included foster homes and an incident of sexual abuse in her childhood and an abusive spouse and tumultuous marriage in adulthood. Because of his concern at the time of plaintiff's admission to the hospital that the seizures may have psychological overlay, Dr. Ferriss ordered a personality evaluation from Dr. Phillip Griffin, a clinical psychologist.
Dr. Ferriss' treatment plan for plaintiff was to withdraw her anti-convulsant medications in order to enhance the possibility of seizures and to monitor her electroencephalographically (with an EEG) in order to locate the portion of the brain where these seizures were originating. Dr. Ferriss' hope was that an EEG abnormality would pinpoint a portion of the brain which could be excised surgically and thereby relieve her of the inciting cause of the seizures. The monitoring process was necessary to determine if plaintiff had complex partial seizures, if she had psychogenic seizures or if she had both or neither type of seizures.
The monitoring process began with an ambulatory EEG which provides some information but not as much information as video EEG monitoring which was used later in the monitoring process. While more convenient for the patient, the ambulatory EEG has fewer electrodes and cannot always detect shorter seizures.
On May 9, 1987, plaintiff exhibited seizure-like behavior including stopping what she was doing, stopping talking and pupils dilating. The ambulatory EEG was normal but *1321 this episode was brief and, in Dr. Ferriss' opinion, this episode was a brief partial complex seizure which was too brief to be recorded by the ambulatory EEG. On May 11, 1987, plaintiff had a seizure observed by technicians just after the ambulatory EEG electrodes had been removed and just before the video EEG monitoring electrodes were applied. On May 12, 1987, plaintiff had a seizure witnessed by Dr. Ferriss and recorded on videotape. This seizure was a definite partial complex seizure according to Dr. Ferriss. An EEG recorded between 2:00 p.m. on May 12, 1987 and 2:00 p.m. on May 13, 1987 showed possibly two positive EEG readings but there were no contemporaneous observations to coincide with these readings. Two suspicious seizure-like sequences were noted on May 15, 1987. On May 17, 1987, Dr. Ferriss observed something that looked like a partial complex seizure.
The results of the monitoring process convinced Dr. Ferriss that plaintiff suffered from intractable partial complex seizures (true organic seizures) and that surgery for this condition might relieve her from seizures completely or at least allow for lower doses of medication to control the seizures. During the monitoring process, Dr. Ferriss did not see any pseudo or psychogenic seizures. Dr. Ferriss stated that it was very difficult to detect the differences between a psychogenic seizure and an epileptic seizure but he felt that his extensive experience in the diagnosis of seizures enabled him to differentiate between these two types of seizures.
Although Dr. Ferriss had ordered a psychological evaluation of plaintiff when she was initially admitted, he did not have the results of that evaluation before the surgery that he recommended was performed on May 21, 1987. Dr. Ferriss stated that he became well acquainted with the plaintiff during her hospital stay and he determined that she was not psychotic and that she knew what she wanted to do, i.e. obtain relief from her seizures. Dr. Ferriss evaluated the plaintiff's personality to his satisfaction and decided that he did not need the results of the evaluation of Dr. Griffin which he originally thought he would need when plaintiff was first admitted to the hospital.
When he discharged plaintiff from Tulane Medical Center for transfer to Southern Baptist Hospital for possible surgery, Dr. Ferriss' discharge diagnosis was epilepsy due to medial temporal sclerosis. He did not mention pseudo seizure diagnosis because plaintiff did not have pseudo seizures during her hospitalization at Tulane.
Dr. Ferriss' determination that plaintiff was a candidate for surgical intervention for the treatment of epilepsy was based on several factors: 1) plaintiff had seizures of a single type which were correlated with a single focus on the EEG; 2) her seizures were disabling to her and were not completely controlled by medication; 3) his opinion was that the reduction in the frequency and severity of seizures would significantly improve the quality of her life; 4) plaintiff had partial complex seizures which were observed by medical professionals and recorded through video EEG monitoring; 5) the EEG was consistent with a lesion in the medial temporal lobe; 6) an MRI later performed at Southern Baptist Hospital confirmed the existence of this lesion; and 7) at that time surgery on the temporal lobe had the highest rate of success for relief of epileptic seizures and was the least likely to have complications.
Dr. Ferriss was of the opinion that plaintiff did not have an urgent need for psychotherapy before having this surgery. He felt that plaintiff was mentally competent to make a decision about this surgery and to want to choose action to obtain relief from her seizures. His opinion was that the demonstrated organic problem which could be treated by surgery should be handled first and psychiatric problems could be addressed afterward. Although the results of the MMPI personality evaluation scored by Dr. Griffin showed that plaintiff had serious psychiatric problems, Dr. Ferriss was of the opinion that plaintiff did not have an impaired ability to properly consider the aspects of the suggested brain surgery. Dr. Ferriss stated that *1322 there was no emergent need for this surgery but there was also no reason to postpone the surgery.

Dr. Richard Corales
Dr. Richard Corales, a defendant in this case, is the neurosurgeon who performed the surgical procedure known as a subtotal temporal lobectomy on plaintiff. He stated that the goal of this surgery was to remove the sclerotic or scarred area of the inside of the left temporal lobe while preserving as much of the normal brain as possible. Dr. Corales testified that plaintiff had a focal specific lesion which was well defined on the MRI scan. During the surgical procedure, Dr. Corales removed the scar which was slightly larger than the scan had revealed. When plaintiff awoke after surgery, it was discovered that she had some paralysis on her right side and aphasia (a total or partial loss of the power to use or understand words) which were known risks of this surgical procedure.
Dr. Corales testified that he relied on Dr. Ferriss' evaluations of pre-surgery tests and observations. He did not consult with any psychiatrist or psychologist prior to surgery. However, he said the confirmation on the MRI of the brain lesion coupled with the workup and diagnosis by Dr. Ferriss led him to the opinion that plaintiff was a strong candidate for the proposed surgery and that she would be better off with the surgery than without the surgery.
Dr. Corales met with the plaintiff several times prior to the surgery and advised her of all the potential benefits, risks and complications associated with this type of surgery. He reviewed the consent form with her. He felt that plaintiff understood the different aspects of the surgery and the gravity of the situation. Dr. Corales discussed all aspects of the surgery in detail with plaintiff's husband.
Tests performed showed that the left side of plaintiff's brain was the dominant side which controlled her ability to speak and understand speech. Because the lesions on plaintiff's brain was on her left dominant side, plaintiff was at higher risk for complications than if the surgery was being performed on the non-dominant side of her brain. Dr. Corales told plaintiff to expect some memory impairment as a result of the surgery, although this impairment could range from very mild to as profound as a twenty percent impairment. He warned plaintiff of a one to three percent risk of major stroke and paralysis, which, in fact, did occur in plaintiff's case. Dr. Corales told plaintiff that the risk of impairment of language skills was approximately five percent.
Dr. Corales told plaintiff that this surgery was elective and was not an emergency. He told her the surgery could be performed at any time and that she had the alternative of continuing to try to control the seizures through medication. He did not offer psychotherapy as an alternative because he did not have any information to suggest that plaintiff was a candidate for psychiatric treatment.
Dr. Corales stated that he recommended surgery because he believed it would give plaintiff relief from her seizures. He felt very comfortable with Dr. Ferriss' diagnosis of partial seizure disorder because of the extensive testing conducted by Dr. Ferriss and because of Dr. Ferriss' reputation as a leading expert in the area of seizure management. Furthermore, the MRI results showed a medial temporal lobe scar in an area which was compatible with her seizure focus defined during her testing at Tulane. Although plaintiff suffered complications from this surgery, Dr. Corales does not think the surgery was inappropriate or improper especially considering that the material removed from plaintiff's brain was evaluated by a pathologist and confirmed to be the type of scarring commonly seen in someone with partial complex seizure disorder.

Dr. Phillip Griffin
Dr. Phillip Griffin, a clinical psychologist, performed a psychological evaluation of plaintiff which included scoring the results of a test known as the Minnesota Multiphasic Personality Inventory or MMPI. There is *1323 no evidence that Dr. Griffin actually interviewed the plaintiff. Based on her MMPI answers, Dr. Griffin concluded that the plaintiff had an enormous potential for chaos and disorganization, seemed to be very emotionally disturbed and might not be able to comprehend something as complicated as the suggested brain surgery. He recommended psychiatric intervention for plaintiff in addition to other needed medical treatments.

Dr. Donald Richardson
Dr. Donald Richardson was the chief of neurosurgery at Tulane Medical Center in 1987 and was a member of the medical review panel in this case which determined that the defendant physicians met the requisite standards of care in plaintiff's case. He testified that temporal lobectomies are used for control of partial complex seizures only if the seizures cannot be controlled by medication or unless the patient has a serious adverse problem from the medication. He stated that before performing surgery, it is imperative to determine that medications have not adequately controlled the organic seizures. Additionally, if a patient has both organic and psychogenic seizures, a physician must differentiate between the two types of seizures.
Dr. Richardson stated that the seizure noted on May 9, 1987 occurred when the medication discontinued by plaintiff the day before was still in her system. However, because the EEG on that date was normal, Dr. Richardson's opinion was that the May 9, 1987 seizure was probably a psychogenic seizure. In plaintiff's case, Dr. Richardson stated that he would have recommended further psychiatric evaluation before deciding to operate.
Dr. Richardson acknowledged that Dr. Ferriss is a recognized expert in the area of seizure disorder treatment. He stated that if a patient was referred to him by someone with Dr. Ferriss' reputation and an MRI confirmed a lesion in the left temporal lobe and the patient was informed of the risks of surgery, he would have considered that patient a viable candidate for surgery. He would not have suggested a psychiatric evaluation before surgery unless he had been told that the patient had a significant number of psychogenic seizures.
With regard to Dr. Corales, Dr. Richardson stated that his discussion of the proposed surgery with the patient and the performance of the surgery were appropriate. The fact that the patient had a bad result from the surgery is not indicative of deviation from acceptable medical practice.
With respect to Dr. Ferriss, the following exchange occurred during the questioning of Dr. Richardson:
Q. Has your opinion changed with regard to the treatment afforded Ms. Morris by Dr. Gregory Ferriss and that he complied with the applicable standard of care with Mrs. Morris' treatment?
A. I have to say yes, I think he did.
This answer is confusing when considering the question posed to Dr. Richardson, but does not clearly show a change in Dr. Richardson's opinion from the time of the medical review panel as claimed by plaintiff. In any event, Dr. Richardson went on to say that he did not see the EEG monitoring report when he served on the medical review panel. He stated that if a patient was having multiple psychogenic seizures that were not substantiated by EEG, his opinion is that such a patient should be reevaluated for surgery and that he would be reluctant to operate on a patient who, when monitored, had several psychogenic seizures and one organic seizure. Dr. Richardson drew his conclusions as to the type of seizures suffered by plaintiff during monitoring from the EEG monitoring report. He admitted that he cannot read an EEG.
He further stated that he relies on a neurologist to interpret an EEG. Dr. Richardson admitted that it is possible for a person to exhibit seizure-like behavior which does not register on an EEG but yet is an epileptic event. He stated that he would defer the decision of whether or not a seizure is epileptic or psychogenic to a neurologist specializing *1324 in the diagnosis of seizures. Specifically, with regard to plaintiff's case, Dr. Richardson said he would defer to Dr. Ferriss' interpretation of the seizure activity and diagnosis of the existence or absence of psychogenic seizures.
Dr. Richardson stated that emotional overlay is not a contraindication of surgery because emotional overlay is almost always present in people suffering from intractable epileptic seizures. Surgery is still indicated even when a person suffers from both intractable epileptic seizures and psychogenic seizures. Dr. Richardson's opinion is that a reasonable patient in plaintiff's position would have consented to the proposed surgery.

Dr. Louis Cohen
Dr. Louis Cohen, a psychiatrist, testified after reviewing plaintiff's medical records. He did not examine the plaintiff. He was of the opinion that plaintiff clearly had true organic epilepsy. He was also of the opinion that plaintiff suffered pseudo or psychogenic seizures in addition to the epileptic seizures. Dr. Cohen said that there are many forms of partial complex seizures, and that psychogenic seizures can mimic partial complex seizures very closely. He agreed that a person can have a brief partial complex epileptic seizure and still have a normal EEG.
Dr. Cohen opined that if there were strong suspicions that many of plaintiff's seizures were psychogenic in nature, more psychiatric testing should have been performed before proceeding with elective surgery to relieve plaintiff of epileptic seizures. He stated that the MMPI report should have been reviewed by plaintiff's physicians before surgery and should have alerted them to have further psychiatric or psychological testing performed. According to Dr. Cohen, plaintiff's history of spouse abuse and unstable marriages should have been "red flags" that her seizures might be psychogenic.
After reviewing plaintiff's records, Dr. Cohen concluded that plaintiff would have been a good candidate for psychotherapy. He believed that some of plaintiff's seizures were manifestations of a psychological condition. Dr. Cohen stated that for a patient with the plaintiff's degree of psychiatric overlay, it was important that the treating physician inform the patient that her psychiatric problems may be causing some of her seizures and that psychotherapy was a viable alternative treatment of psychogenic seizures. Dr. Cohen thinks it is possible that plaintiff could have been seizure-free or almost seizure-free with medications treating her epileptic condition.
Dr. Cohen agreed that plaintiff had true organic seizures at Tulane and that the source of these seizures was a scarred area within the temporal lobe. He also agreed that Dr. Ferriss was able to identify the origin of the epileptic seizures and that psychotherapy is not a reasonable treatment for intractable epileptic seizures. From the records, Dr. Cohen formed the opinion that plaintiff was competent or had the capacity to give informed consent to this surgery. However, he also concluded that plaintiff's treatment by Dr. Ferriss was substandard in failing to first address plaintiff's psychiatric problem.

Dr. Paul Ware
Dr. Paul Ware, a neuropsychiatrist, examined plaintiff twice, once in 1990 and again in 1995. He reviewed plaintiff's medical records and testified that, in his opinion, the care given to plaintiff by Dr. Ferriss was subminimal from a neurologist's viewpoint because there was no recorded mental status examination. He believes that the physicians who treated plaintiff at Tulane did not adequately document their evaluation results.
Dr. Ware stated his opinion that psychotherapy was a very viable alternative for plaintiff's psychogenic seizures. He reviewed the videotape from the video EEG monitoring and determined that she had pseudo or psychogenic seizures and one partial complex seizure. He believes that it was essential to inform plaintiff that psychiatric overlay was suspected in her case and that *1325 psychotherapy or psychiatric intervention was a viable alternative treatment to surgery. According to Dr. Ware, the videotapes and other records suggest that at least one of plaintiff's anti-convulsant medications may have been effective in treating her organic epilepsy. He based this opinion on his conclusion that plaintiff did not have a true organic seizure until several days after her medications were discontinued.
Dr. Ware was of the opinion that the evaluation and treatment of plaintiff at Tulane did not meet minimal standards of care for neurology or for psychiatry. He based his opinion on the fact that Dr. Ferriss noted in his admission note and diagnosis that plaintiff had considerable psychological overlay and was possibly suffering from psychogenic seizures yet he made a treatment decision without considering the results of the psychological evaluation which he ordered.
Dr. Ware agreed that Dr. Ferriss performed a good, detailed workup which demonstrated that plaintiff had organic epilepsy and partial complex seizures. However, Dr. Ware believes plaintiff had even more psychogenic seizures which were not addressed at all. According to Dr. Ware, plaintiff should have been advised that she had psychogenic seizures and that surgery was not going to relieve her of those seizures.
After viewing the videotapes, Dr. Ware saw, in his opinion, one true partial complex seizure and several other episodes that were consistent with pseudo seizures. However, he could not say that he was even ninety percent sure that they were pseudo seizures. Dr. Ware agreed that a person can have a brief partial complex episode and still have a normal EEG. He also agreed that the most common treatment for intractable epileptic seizures is surgical treatment if an isolated focus of the brain is shown and can be removed. He stated that in plaintiff's case, there was shown an isolated focus of the brain which could be removed surgically.
However, Dr. Ware's opinion is that plaintiff's epilepsy was not intractable and was fairly well controlled on medication. Dr. Ware admitted that plaintiff was not seizure-free with the medication but he thinks that even if her seizures occurred as often as once every other week, this was not intractable enough to recommend surgery.

Dr. Robert Gumnit
Dr. Robert Gumnit is a neurologist specializing in the treatment and diagnosis of epilepsy, surgical treatment of epilepsy, EEG interpretation and diagnosis of pseudo or psychogenic seizures. He reviewed plaintiff's records and agreed with Dr. Ferriss' admit diagnosis. He stated that Dr. Ferriss was within the standard of care in relying on Dr. Gulick's opinion that plaintiff had been refractory to anti-epileptic medications. Dr. Gumnit also agreed that Dr. Ferriss' treatment plan at Tulane was appropriate. He also agreed with Dr. Ferriss' discharge diagnosis of epilepsy due to medial temporal sclerosis. His reasons for agreeing with that diagnosis were that plaintiff's history was compatible with medial temporal sclerosis, plaintiff had unequivocal partial complex seizures arising from one temporal lobe and the pathologist found confirmation of medial temporal sclerosis after surgery.
Dr. Gumnit reviewed Dr. Ferriss' records and concluded that Dr. Ferriss did consider that plaintiff might be suffering from psychogenic seizures. Dr. Ferriss' monitoring report showed that he reviewed each episode very carefully to determine the type of seizure. Dr. Gumnit stated that the standard of care for a neurologist does not require a formal mental health examination but, rather, is something that is done informally as a physician examines a patient. He found evidence in the record that Dr. Ferriss talked to plaintiff at length, tested her and came to the conclusion that she was capable of making an informed judgment.
Dr. Gumnit agreed that the event on May 9, 1987 may have been a brief partial complex seizure even though it did not register on the ambulatory EEG. The videotape from the video EEG monitoring showed a fairly prolonged partial complex seizure on May 12, 1987. He agreed with the EEG *1326 report finding that the partial complex seizure was most probably of left temporal origin. Dr. Gumnit described the episode of May 17, 1987 as a brief partial complex seizure followed by a brief period of post ictal (seizure) confusion. He disagreed with Dr. Ware's opinion that this event was a pseudo seizure. As for the suspicious seizure-like event recorded on the EEG on May 12, 1987 but not confirmed by contemporaneous observation, Dr. Gumnit stated that it was possible that the technicians were not paying attention to plaintiff or were distracted at the time.
Dr. Gumnit stated that the standard of care did not require Dr. Ferriss to order a psychological evaluation. He said that physicians sometimes order tests on the admission of a patient and realize later that those tests were not necessary. Dr. Gumnit said that the use of MMPI studies in evaluating a patient for epilepsy surgery is controversial because these studies are subject to misinterpretation if interpreted by someone who does not have a strong understanding of epilepsy.
According to Dr. Gumnit, nothing in the record indicated the necessity of a psychiatric evaluation or a psychiatric problem which needed to be addressed immediately. He could not find anything in the record to indicate that plaintiff's surgery should be delayed, especially when considering the fact that anytime someone suffers from seizures, there is a possibility of injury or death.
Dr. Gumnit's opinion is that Dr. Ferriss conducted a proper neurological examination of plaintiff and that plaintiff was a proper candidate for the surgical procedure that she underwent. He felt that Dr. Ferriss exercised the due care of an evaluating physician in his treatment of plaintiff. He agreed that psychiatric treatment was not a reasonable alternative for plaintiff's condition. He admitted that distinguishing psychogenic seizures from epileptic seizures can be very difficult. He said that a neurologist, and not a psychologist, must determine if a patient is having psychogenic seizures. Dr. Ferriss found no evidence of psychogenic seizures even though he carefully monitored plaintiff for this type of seizure. However, Dr. Ferriss did find evidence of seizures that were compatible with temporal lobe epilepsy and Dr. Gumnit believes there was every indication to proceed with surgery.

Dr. Herman Colomb
Dr. Herman Colomb, a psychiatrist, testified that because Dr. Ferriss found evidence that plaintiff had partial complex seizures, there was no need to have a psychiatric evaluation before surgery because plaintiff had no acute psychiatric problem requiring immediate attention. His opinion was that if a clearly identified organic defect exists that can be surgically alleviated, it should be addressed before any psychiatric treatment. One reason he gave was that any relief from seizures accomplished by this surgery may have positive psychological benefits for the patient. Dr. Colomb also stated that plaintiff's psychological problems were complex and would involve a lengthy treatment period, possibly several years.

Dr. Thomas Gulick
Dr. Thomas Gulick, a neurologist from Monroe, Louisiana, treated plaintiff for seizure disorder for approximately one year before referring her for treatment to Dr. Ferriss. He diagnosed her as having epilepsy with partial complex seizures. Plaintiff was taking several anti-epileptic medications, none of which was successful in controlling her seizures. Dr. Gulick referred plaintiff to Dr. Ferriss when he reached the conclusion that plaintiff's seizures were intractable.

Dr. Donald Adams
Dr. Donald Adams, a neurologist and a member of the medical review panel in this case, testified by deposition. Dr. Adams agreed that the monitoring process used by Dr. Ferriss is the best way to determine if a person is suffering from seizures and, if so, what type of seizures. He stated that he does not order MMPI tests for epilepsy patients.

ASSIGNMENT OF ERROR ONE
Initially plaintiff argues that Dr. Ferriss breached the applicable standard of care by *1327 not recognizing the possibility of psychogenic seizures and conducting further psychological testing before proceeding with surgery. We disagree.
It is undisputed that plaintiff suffered from epileptic partial complex seizures which were not completely controlled by anti-convulsant medications. Dr. Ferriss considered the possibility that plaintiff also suffered from psychogenic seizures during an extensive ambulatory and video EEG monitoring of the plaintiff. Dr. Ferriss, who is a recognized authority in the diagnosis of seizures, determined that plaintiff was not experiencing psychogenic seizures. Of all the medical experts who testified on behalf of both plaintiff and the defendants, only Drs. Ferriss, Corales and Gulick actually treated and observed plaintiff prior to the 1987 surgery while the other experts based their opinions on a review of the records. There is expert opinion in the record which supports Dr. Ferriss' opinion that plaintiff did not require psychiatric treatment before proceeding with surgery. The evidence established that Dr. Ferriss pinpointed the area of the brain where the epileptic seizures were originating and this determination was later confirmed by an MRI scan. The evidence also supports Dr. Ferriss' treatment program for plaintiff as well as his opinion that, based on the monitoring results, plaintiff was a good candidate for a temporal lobectomy. Although we recognize that there is other expert opinion which suggests a contrary conclusion, we simply cannot say that the trial judge's decision was clearly wrong.

ASSIGNMENT OF ERROR TWO
In the second assignment of error, plaintiff argues that the trial court erred in finding that Drs. Ferriss and Corales obtained the informed consent of plaintiff for this surgery. Specifically plaintiff argues that she should have been informed prior to surgery of the possibility of psychological treatment as an alternative to surgery.
Under the Louisiana informed consent doctrine, physicians are required to provide their patients with sufficient information to permit the patient to make an informed and intelligent decision on whether to submit to the proposed course of treatment. This information should include, if possible, the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment. A physician must also inform a patient of any alternatives that exist to a surgical procedure. LSA-R.S. 40:1299.40; Hondroulis v. Schuhmacher, 553 So.2d 398, 411 (La.1988).
Initially we observe that there is substantial evidence which shows that plaintiff was fully informed of all possible risks and complications of the surgery and that she understood and was mentally capable of making this decision. Despite plaintiff's assertion that the results of the MMPI suggested otherwise, the evidence simply does not support any inability of plaintiff to fully comprehend the explanations given to her.
We further conclude that the trial judge was not clearly wrong in rejecting plaintiff's assertion that she should have been advised of the alternative treatment of psychotherapy. In order to prove that psychological or psychiatric treatment was a reasonable alternative to surgery, the plaintiff had to prove that this alternative was an accepted medical treatment for her condition, which was organically based. See Steele v. St. Paul Fire and Marine Insurance Company, 371 So.2d 843 (La.App. 3rd Cir.1979), writ denied, 374 So.2d 658 (La.1979). A physician has no duty to disclose alternative treatments or procedures which are not accepted as feasible. Id.
First, the evidence is undisputed that plaintiff had a lesion on the brain and suffered epileptic (organic) seizures. Psychological or psychiatric treatment is not a recognized, feasible treatment for that condition. Second, there was no finding by the trial court that plaintiff actually suffers *1328 psychogenic seizures and the evidence is inconclusive as to whether she suffered from those type seizures. Thus, there was no need to offer an alternative treatment given those circumstances. Third, even assuming as a fact that plaintiff did suffer psychogenic seizures, there is substantial evidence which suggests that the organic problem (brain lesion) had to be treated first, otherwise psychological treatment may be ineffective. Finally, and most important, the expert opinions varied on whether plaintiff should have been advised prior to surgery of the alternative psychological treatment. Under these circumstances, we simply cannot say the trial judge was clearly wrong in his conclusion.[6]
For the foregoing reasons, the trial court judgment is affirmed.
AFFIRMED.
NOTES
[1] Plaintiffs' estranged husband is also a plaintiff, however he did not appeal. Dr. Thomas Gulick was also a defendant. He was dismissed at the close of plaintiff's case. Plaintiff did not appeal his dismissal.
[2] During that period of time, plaintiff became pregnant which required alterations in her medication and dosage.
[3] A partial complex seizure manifests itself in a variety of ways, and, according to Dr. Ferriss, involves staring and some alteration in consciousness.
[4] Psychogenic seizures are non-organic. That is, they are the result of psychological/psychiatric problems.
[5] A medical review panel of two neurosurgeons and one neurologist previously found that all three defendant physicians met the requisite standards of care.
[6] Because we find there was no need to advise plaintiff of any alternative treatment, we pretermit the question of who is responsible for obtaining a patient's informed consent, the surgeon or the treating physician, or both.