655 So.2d 795 (1995)
Lula JACKSON, et al.
v.
STATE of Louisiana, Through CHARITY HOSPITAL OF LOUISIANA AT NEW ORLEANS, et al.
No. 94-CA-2090.
Court of Appeal of Louisiana, Fourth Circuit.
May 16, 1995.
*796 J. Nelson Mayer, Valteau, Harris, Koenig & Mayer, New Orleans, for plaintiffs/appellants.
Richard Ieyoub, Atty. Gen., Miles G. Trapolin, Sp. Asst. Atty. Gen., New Orleans, for defendant/appellee.
Before KLEES, JONES and WALTZER, JJ.
JONES, Judge.
Plaintiff/Appellant Lula Jackson sued Charity Hospital when her husband, Samuel Jackson, died after waiting 2½ hours at Charity Hospital before being examined. Mrs. Jackson appeals the judgment of the trial court, which ruled in favor of Charity Hospital on the issue of whether Charity Hospital had breached the standard of care.

Facts
At approximately 4 a.m., on the morning of February 3, 1983, Lula Jackson, wife of Samuel Jackson, heard noises in their house and awakened her husband to investigate. After finding nothing, Samuel Jackson returned to bed and laid down. After laying down, Lula Jackson observed Samuel Jackson's body starting to jerk along with blood running from his nose and mouth. Lula Jackson called the operator, who sent an ambulance and paramedics to the Jackson's residence. Upon arrival at the house, Samuel Jackson was sitting upright in bed with blood on his tee-shirt and bedding. The paramedics took his vital signs and advised him to go to the hospital immediately. Mr. Jackson refused to go in an ambulance, so Mrs. Jackson, being a nurse at Charity Hospital, drove him to the hospital.
In 1983, the emergency room at Charity was divided into two units, the medical emergency room and the trauma facility. Each unit was a separate facility staffed by seven interns and two residents per unit. The trauma unit treated patients who had suffered from gunshot wounds, stabbing wounds and other trauma related incidents. People with sicknesses or illnesses were treated in the medical emergency room. Mr. Jackson was taken to the medical emergency room.
At about 5:55 a.m., Mr. and Mrs. Jackson arrived at the medical emergency room. Mrs. Jackson let her husband out of the car at the emergency room ramp to wait as she parked the car. After going inside, Mr. and Mrs. Jackson gave his medical history to the triage nurse. The triage nurse is the first contact a patient has upon entering the medical emergency room. After giving the history to the triage nurse, Mr. Jackson's vital signs were taken and he was sent to the waiting room.
While in the waiting room, Mrs. Jackson observed only about five or six other patients waiting to be treated, although she did not know the condition of these patients. Mrs. Jackson was anxious and wanted her husband to be seen immediately. She told doctors that her husband's head and tongue were hurting, but was told that they had to wait their turn.
At 8:10 a.m., two hours and fifteen minutes after they first arrived at the hospital, Mr. Jackson was called into the emergency room to be examined. Soon after being seated on the examining table, Mr. Jackson suffered another seizure and was pronounced dead at 9:20 a.m.
Mrs. Jackson filed suit for damages against the State of Louisiana through Charity Hospital alleging emergency room care fell below the standard of care of the community and that the substandard care caused the death of Samuel Jackson. The trial court found in favor of defendants and dismissed the plaintiffs' case. It is from this judgment that the plaintiffs appeal. The trial court did not enter reasons for judgment. Plaintiff argues that the trial court erred in dismissing her case and not awarding damages.
La.R.S. 9:2794 states, in pertinent part, that in a malpractice action based on the negligence of a physician, the plaintiff must prove by a preponderance of the evidence:
1) the standard of medical care for the medical specialty involved;
2) that the defendant breached the standard of care; and
3) that the plaintiff suffered injuries due to the breach of the standard of care.
*797 The issue in this case is whether, under the circumstances on February 3, 1983, a 2½ hour delay in treating Samuel Jackson fell below the standard of care Charity Hospital was required to exercise.
In determining whether a defendant possessed the requisite degree of knowledge or skill or whether he exercised reasonable care or diligence, the court is guided by expert witnesses who are members of defendants profession and who are qualified to testify. Gurdin v. Dongieux, 468 So.2d 1241, 1245 (La.App. 4th Cir.1985), writ denied, 474 So.2d 946 (La.1985).
The plaintiffs called Dr. Bruce Samuels as their expert. Dr. Samuels was not an emergency room doctor at the time of Mr. Jackson's death nor at the time of trial. He admitted that there was a medical specialty of emergency room medicine and that he was not a specialist in that area of medicine. In any event, Dr. Samuels was accepted as an expert in the field of internal medicine and as to emergency room medicine to the extent of his education, training and experience.
Dr. Samuels reviewed the Charity Hospital records and was of the opinion that based upon the history given by the Jacksons of first time seizure, the number of residents and interns on staff, and the number of patients in the emergency room, Charity Hospital breached the standard of care in connection with the treatment of Samuel Jackson.
Charity Hospital called Dr. Richard McConnell as an expert witness in ER medicine. He has actively practiced ER medicine since 1975. Dr. McConnell is an ER doctor at Ochsner. Dr. McConnell testified that it was not a breach of the standard of care for Mr. Jackson to wait 2½ hours to be seen by an ER doctor because all of his vital signs were stable when he arrived. Dr. McConnell testified that from his experience a patient can wait up to 24 hours at public hospitals depending on the condition of the patient. Patients with urgent medical needs are seen and treated before patients who arrive with non-urgent medical complaints.
On the morning of February 3, 1983, there were five or six other patients in the waiting room when Mr. Jackson arrived. There was no testimony as to the condition of these other patients.
In Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991), the Supreme Court outlined the burden of proof and appellate standard of review in such cases as follows:
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained.... Resolution of each of these inquiries are determinations of fact which should not be reversed on appeal absent manifest error....
Id. at 1276. Citations omitted.
In the case at bar, defendants raise questions about the ability of plaintiffs' expert to testify about ER medicine because of his limited exposure in the field. However, even if the two experts' testimony were to be given equal weight, the appellate court must give deference to the trial court's ruling. When expert opinions contradict concerning compliance with applicable standards of care, the trial court's conclusion will be granted great deference. Charpentier v. Lammico Insurance Co., 606 So.2d 83, 87 (La.App. 3 Cir.1992). The trial court ruled that it was not a breach of the standard of care for Mr. Jackson to wait 2½ hours before being treated. The trial court also held that the delay was not the cause of Mr. Jackson's death. Mr. Jackson died of a heart attack after having another seizure. According to plaintiff's expert witness, Dr. Samuels, an IV and other blood work should have been started within fifteen minutes after arrival at the hospital. However, Dr. Samuels admits that neither of these procedures would have prevented another seizure or heart attack.
Dr. McConnell, defendant's expert witness, disagreed with Dr. Samuels about treatment of the patient. He opined that it is not the *798 standard of care for ER's to start an IV within fifteen minutes. More importantly, an IV would not have prevented Mr. Jacksons death.
We find that the trial court did not commit manifest error in dismissing the plaintiff's case. For the foregoing reasons, the trial court's judgment is affirmed.
AFFIRMED.