DENNIS R. BAGNERIS, SR., Judge.
| , Dr. Ralph Nix appeals the trial court’s ruling that he breached the applicable standard of care in his treatment of plaintiff, Catherine Hall, and that the breach was a cause-in-fact of Ms. Hall’s damages. For the following reasons, we hereby affirm.
FACTS
In September 1999, Dr. Nix performed an eye exam on Ms. Hall whereby he noted that Ms. Hall had a small macular hole in her right eye and a larger macular hole in her left eye. After advising Ms. Hall to repair the reopened macular hole in the right eye, Dr. Nix performed a pars plana vitrectomy[1] on September 17, 1999 at Memorial Medical Center. In performing the surgery, Dr. Nix testified that although there is a 20% concentration of SF6 gas, he chose a 30% concentration of SF6 as the vitreous substitute for this surgery. The medical records from Memorial Medical Center indicate Ms. Hall was administered Demerol on seven occasions within 24 hours of surgery. Dr. Nix contends a dose of Demerol is 50 milligrams |2and Ms. Hall received only four doses because the amounts were titrated to determine how much was necessary to alleviate Ms. Hall’s pain.
At trial, Ms. Hall testified that Dr. Nix neither saw her in the hospital following the surgery nor came to her room to measure her intraocular pressure[2]. Ms. Hall testified that although she was in pain, she *65 was discharged from the hospital on September 18, 1999. Ms. Hall testified that her daughter attempted to contact Dr. Nix on September 18th because of the pain in her right eye, but that Dr. Nix did not see her until Sunday evening on September 19, 1999. Ms. Hall testified that this was the first time Dr. Nix measured the intraocu-lar pressure in her right eye by using a Schiotz tonometer, an instrument plaintiff agues underestimates intraocular pressure. After performing an eye examination, Dr. Nix concluded that the exam was normal and that her intraocular pressure was 22 mmhg. According to Jennifer Chopin, Ms. Hall’s daughter who accompanied her to Dr. Nix’s office on the evening of September 19, 1999, Dr. Nix found no reason for her mother’s pain because her pressure was low.
On September 20, 1999, during Ms. Hall’s follow-up visit, Dr. Nix noted the presence of an intraocular pressure of 35 mmhg by using the Schiotz tonometer. Dr. Nix testified he gave Ms. Hall a topical eye drop, Diamox, to reduce eye pressure; however, Ms. Hall disputes this. The record indicates that Dr. Nix referred Ms. Hall to Dr. Gholam Peyman at LSU Eye Center for an evaluation and recommendation regarding a potential eye infection.
| a Ms. Hall was seen at LSU Eye Center on the afternoon of September 20, 1999, and had a right eye pressure of 54 mmhg. A procedure was performed at that time to reduce the eye pressure and Ms. Hall was required to have cataract surgery and anterior chamber reconstruction on September 22 and 23, 1999. Thereafter, Ms. Hall was referred to Dr. Claude F. Burgoyne, a glaucoma specialist, who performed a laser periphery iridectomy and a trabeculectomy in her right eye in October 1999. Ms. Hall contends that Dr. Nix committed malpractice by allowing the intraocular pressure to become too high from September 17 through September 20, 1999, which allegedly caused injury to her optic nerve and resulted in glaucoma and vision loss.
A medical review panel concluded that Dr. Nix “failed to comply with the appropriate standard of care as charged in the complaint. Specifically, the panel finds that the patient should have been evaluated by the end of the first post-operative day.” After a four-day bench trial, the trial court rendered judgment in favor of Ms. Hall and against Dr. Nix for medical malpractice arising from his treatment from September 17, 1999 through September 20, 1999. The trial court awarded three hundred fifty thousand dollars ($350,000.00) in general damages, fifty thousand dollars ($50,000.00) for loss of enjoyment of life, and two hundred twenty-two thousand seven hundred seventeen dollars ($222,717.00) as special damages, with the amount subject to the limitation of recovery as provided for in La. R.S. 40:1299.42. Thereafter, the trial court granted Ms. Hall’s motion to tax costs and awarded twelve thousand two hundred ten dollars and four cents ($12,210.04) in court costs. The trial court found that Ms. Hall carried her burden of proof by a preponderance of the evidence establishing the standard of care, | ¿defendant’s negligence, and that Dr. Nix’s negligence caused permanent damage to Ms. Hall.
On appeal, Dr. Nix assigns the following assignments of error: (1) the trial court erred in finding Dr. Nix’s breach of the standard of care was the sole proximate cause of Ms. Hall’s injuries as nearly four years post surgery her vision was 20/40 and she was negative for glaucoma; (2) the trial court committed legal error in denying Dr. Nix’s motion to submit medical testimony and evidence on the effect of a hit to her head and eye injury in automobile accident; (3) the trial court committed legal error in failing to apportion fault to *66 non-party automobile driver and LSU resident tortfeasors and finding Dr. Nix solidarity liable; (4) the trial court erred in failing to abate damages as Ms. Hall failed to mitigate by seeking employment during the period of her improved vision; (5) the trial court erred in failing to consider high intraocular pressure which is a known complication of vitrectomy; (6) the trial court erred in failing to assign Ms. Hall comparative fault in failing to timely present to LSU after diagnosis of high pressure and possible infection; (7) the trial court’s awards of damages in all categories were abusively excessive; (8) the trial court committed legal error in denying the motion for direct verdict and involuntary dismissal after learning Ms. Hall concealed facts relating to the head blow and cause of her blurry 20/200 vision; and (9) the trial court committed legal error in taxing Dr. Nix with costs.
APPLICABLE LAW
In a medical malpractice action, the plaintiff must prove three elements: (1) the degree of knowledge or skill required by doctors in the same field in a similar locale; (2) that the defendant physician lacked or failed to utilize that standard of care; and (3) that the defendant’s conduct was the proximate cause of the 5plaintiff’s injury. See La. R.S. 9:2794; Serigne v. Ivker, 00-0758, 0759, pp. 4-5 (La.App. 4 Cir. 1/23/02), 808 So.2d 783, 787. Determinations of the requisite level of skill required, whether the standard of care has been breached and whether causation exists are findings of fact, which can be reversed only upon a finding of manifest error. Id. (citing Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991)). Therefore, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are as reasonable. Arceneaux v.Domingue, 365 So.2d 1330, 1333 (La.1978).
When the trial court’s findings are based upon the credibility of witnesses, the manifest error standard requires that the appellate court give great deference to the trial court because only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily upon the listener’s understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Nevertheless, the reviewing court may find manifest error in a credibility determination if the witness’s testimony is so internally inconsistent or implausible on its face, or is so contradicted by documents or other objective evidence, that a reasonable fact finder would not credit it. However, where such factors are absent, and the trial court’s finding is based upon a decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 844-45 (citations omitted).
Louisiana jurisprudence has held that expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions. Martin v. East Jefferson General Hospital, supra, at 1277. ^Determinations of the credibility of expert witnesses are subject to the same manifestly erroneous/clearly wrong standard of review as are credibility determinations concerning fact witnesses. Id.
DISCUSSION
The first issue to address is whether the trial court erred in finding Dr. Nix’s breach of the standard of care was the sole proximate cause of Ms. Hall’s injuries. Dr. Nix argues that there were several causes as to why Ms. Hall suffered damages to her optic nerve and trabecular *67 meshwork, specifically: (1) a previous surgery in 1998 to repair a macular hole; (2) Ms. Hall’s accident in August of 1999 whereby she hit her head on the dashboard; and (3) Ms. Hall’s delay in being treated at LSU on September 20, 1999.
At trial, Dr. Roberto Diaz-Rohena, Ms. Hall’s expert who is a board-certified ophthalmologist with special training in vi-treoretinal disease and surgery, testified as to the applicable breaches of the standard of care. Dr. Diaz-Rohena concluded the following breaches of the applicable standard of care in Dr. Nix’s treatment of Ms. Hall were: (1) failing to monitor the intraocular pressure following the pars plana vitrectomy using 30% SF6 expansive gas on September 17, 1999; (2) failing to monitor the eye pressure and visit Ms. Hall in the hospital, especially in light of Ms. Hall’s complaints of pain; (3) failing to conduct an appropriate eye examination on the evening of September 19, 1999; (4) using a Sehiotz tonometer to derive intrao-cular pressure readings on the surgical eye despite the manufacturer of the SF6 gas’s warning that the Sehiotz tonometer would underestimate the intraocular pressure in the presence of SF6 30% gas; (5) failing to provide the patient with in-office samples of intraocular pressure lowering medications on the evening of September 19, 1999; (6) failing to refer the |7patient immediately to LSU as an emergency on the evening of September 19, 1999, if Dr. Nix truly suspected an infection; (7) failing to conduct an appropriate eye examination on September 20, 1999; and (8) failing to perform intraocular pressure readings pri- or to embarking on the surgery of September 17, 1999.
At trial, the medical records reveal that Ms. Hall’s family had no medical history or diagnosis of glaucoma. Dr. Nix testified that he evaluated the optic nerve in Ms. Hall’s surgical eye prior to his surgery, and there was no evidence of any damage to the optic nerve. Dr. Diaz-Rohena testified at trial as to what happens to a patient when an expansive gas creates an increase in intraocular pressure:
As this bubble is expanding inside the eye, different things [sic]. I’m going to start from the back and come forward. One of the main concerns is that the pressure can push on the optic nerve, and it can do two things there. It can reduce the blood flow which can lead to a vein or arterial occlusion and cause a stroke in the eye.
It can also, just because it’s pushing on the optic nerve, it can start you on the path of glaucoma. When we look at the front of the eye, especially if the patient is phakic, which that means that they have their natural lens in place. That gas bubble can push the lens forward and close the angle, and you can get what’s called an angle closure glaucoma.
Dr. Diaz-Rohena also testified as to how an increased intraocular pressure can impact a patient’s trabecular meshwork:
A. So, one of the important things is when you have this pressure building up and again it pushes the iris forward, there is no movement of aqueous or fluid in the eye towards the drainage system. That’s what the trabecular meshwork is. You start getting adhesions because there is no flow. There should be liquid.
Q. Adhesions is scar tissue, correct?
IsA. Scar tissue will start to form. You think this is — a trabecular mesh-work is 360 degrees. You think of a canal which fluid is going through. So, if I block it everywhere, there is nothing going through. I get scar *68 tissue. The trabecular meshwork has now been damaged.
Aside from that, the lens — the natural lens — being pushed forward by that gas causes a gas-induced cataract which will make the lens even expand more and even push forward even more.
The medical records from LSU reference Ms. Hall as being diagnosed with glaucoma, a disease which Dr. Diaz-Rehe-na related to Dr. Nix’s breach in the standard of care following the surgery on September 17. Further, Dr. Diaz-Rohena testified that the following damages relate on a more-probable-than-not basis to Dr. Nix’s breach of standard of care: (1) Ms. Hall’s cataract, which required cataract surgery; (2) Ms. Hall’s loss of her anterior chamber, which required an anterior chamber reconstruction; (3) Ms. Hall’s pressure problems, which required a peripheral iridectomy
Although Dr. Soffy Botero, defendant’s expert ophthalmologist, testified by deposition that the damage to Ms. Hall’s eye may have been caused by Ms. Hall hitting her head coupled with the surgery performed by Dr. Nix, the trial court, in viewing all of the evidence, concluded that it was more probable than not that Ms. Hall’s injuries were caused by the substandard conduct of Dr. Nix. After reviewing the record, we find no manifest error in this finding.
The second issue is whether the trial court committed legal error in denying Dr. Nix’s motion to submit medical testimony and evidence on effect of a hit to her head and eye injury in an automobile accident. We find no merit in this assignment of error as the trial court signed an order on March 15, 2010, allowing Dr. Nix until April 1, 2010, to provide additional evidence regarding Ms. Hall’s ^testimony in which she stated she may have hit her head in an automobile accident prior to the surgery in August 1999. In fact, Dr. Soffy Botero’s deposition was filed into the record on April 15, 2010.
The third issue is whether the trial court erred in failing to apportion fault to non-party automobile driver and LSU resident tortfeasors. Dr. Nix argues that the trial court was legally bound to apportion fault amongst joint tortfeasors regardless of their presence at trial. However, as Ms. Hall correctly points out, Dr. Nix failed to present any evidence to support the affirmative defense of third party fault. As such, we find no error in the trial court’s judgment, which found Dr. Nix solidarity liable.
The fourth issue is whether Ms. Hall failed to mitigate the damages by failing to seek employment during the period of her improved vision. Specifically, Dr. Nix argues that the medical testimony revealed that Ms. Hall’s vision could have been corrected and that she was capable of employment with specialized equipment. While it is true that a tort victim has an affirmative duty to make every reasonable effort to mitigate her damages, this duty only requires that the injured party take reasonable steps to minimize the consequences of the injury. See Campbell v. Robinson, 08-1429, p. 5 (La.App. 4 Cir. 4/8/09), 10 So.3d 346, 349; Dixie Services, L.L.C. v. R & B Falcon Drilling USA, Inc., 05-1212, 06-1209, p. 6 (La.App. 4 Cir. 3/21/07), 955 So.2d 214, 219. Further, an injury victim does not fail to mitigate her damages when she refuses to undergo treatment which would not significantly alleviate her disability, carries risks of failure, when the treatment is painful, or when she is unable to pay for the treatment. Flemings v. State, 07-1290, p. 17 (La.App. 4 Cir. 8/26/09), 19 So.3d 1220, 1231.
| inMs. Hall testified that although her eyes did improve after LSU performed several surgeries on her right eye following Dr. Nix’s treatment, she noted that the *69 doctors declared her legally blind and would not approve her to return to work. Also worth noting is a letter, written on October 21, 1999, whereby Dr. Burgoyne indicates to Ms. Hall that “it is most likely that you have suffered a profound long-lasting loss of vision in your right eye.” After reviewing the record, we fail to find evidence indicating that Ms. Hall’s conduct after Dr. Nix’s treatment was unreasonable or that she refused specialized training. As such, _we find no merit in this assignment of error.
The fifth issue to address is whether the trial erred in failing to consider that high intraocular pressure is a known complication of vitrectomy. Dr. Nix argues that because high pressure is a known risk and because Ms. Hall was referred immediately upon indication of same, then he did not fail to diagnose or contribute to the complications resulting therefrom.
From reviewing the record, it is undisputed that high intraocular pressure is a known complication of vitrectomy. However, the trial court’s judgment found in favor of Ms. Hall and against Dr. Nix “for medical malpractice arising from his treatment rendered to plaintiff from September 17, 1999 through September 20, 1999.” As the judge stated in her reasons for judgment:
It is Dr. Diaz-Rohena’s expert opinion that defendant, or Ralph Nix, M.D. breached the standard of care applicable to vitral retina surgeons by (1) failing to properly monitor plaintiff, Catherine Hall from September 17, 1999 through September 20, 1999 post-operatively after administering SF6 30% gas, and (2) failing to diagnose intraocular pressure on September 20,1999.
The Court finds plaintiff has carried her burden of proof by a preponderance of the evidence, the prevailing | ^standard of care, defendant’s negligence, and that Dr. Nix’s negligence caused permanent damage to Plaintiff.
Accordingly, we find no merit in this assignment of error.
The sixth issue to address is whether the trial court erred in failing to assign Ms. Hall comparative fault in failing to timely present to LSU Eye Center on the afternoon of September 20, 1999. We find no merit in this assignment of error as there is no medical evidence in the record to support this argument.
The seventh issue to address is whether the trial court’s awards of damages were abusively high. Dr. Nix argues that the trial court’s award was abusively high and failed to take into consideration joint liability, comparative fault, and mitigation of damages. Further, Dr. Nix argues the trial court’s reliance on Dr. Rice’s calculation of past, present, and future lost wages was not supported by the tax returns introduced.
The well-settled standard of review for general damages is whether the trial court abused its discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). The trial court’s discretion “is ‘great’ and even vast, so that an appellate court should rarely disturb an award of general damages.” Id. Although reasonable persons may disagree regarding an award of general damages in a particular case, “[i]t is only when an award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.” Id. Only if an abuse of discretion is found will the reviewing court refer to prior awards, and then only for the purpose of determining the highest or lowest point within the court’s discretion. Logan v. 12Brink’s, *70 Inc., 2009-0001, p. 13 (La.App. 4 Cir. 7/1/09), 16 So.3d 530, 540 (citing Riley v. Maison Orleans II, Inc., 2001-0498, p. 11 (La.App. 4 Cir. 9/25/02), 829 So.2d 479, 487). For a trial court to have abused its vast discretion, the award “must be so high or so low in proportion to the injury or fault that it ‘shocks the conscience.’ ” Id.
After reviewing the record, we do not find that the trial court abused its vast discretion with respect to the general damage award of $400,000.00, nor do we find that the award shocks the conscience. Further, we find no countervailing evidence to dispute Ms. Hall’s loss of earnings and medical expenses. As such, we find no error in the trial court’s award of damages.
Dr. Nix’s eighth assignment of error alleges that the trial court committed legal error in denying the motion for directed verdict and involuntarily dismissal after learning Ms. Hall concealed facts relating to the head blow and cause of her blurry 20/200 vision. Dr. Nix did not brief his eighth assignment of error. Uniform Rules-Courts of Appeal Rule 2-12.4 provides that assignments of error not briefed may be considered abandoned. Accordingly, we consider Dr. Nix’s eighth assignment of error abandoned.
In Dr. Nix’s ninth assignment of error, he argues that the trial court committed legal error in taxing him with costs. Specifically, Dr. Nix argues that because the Patient’s Compensation Fund (“PCF”) intervened, he is precluded from paying costs. However, we find no error in the trial court’s finding that a voluntary dismissal on behalf of the PCF has the same effect as if a suit had never been instituted; thus, the limitation of La. R.S. 40:1299.42(B)(2) is in applicable in this matter.
| ^Accordingly, we find no error in the trial court judgment, which found in favor of Ms. Hall and against Dr. Nix for the treatment rendered to her from September 17, 1999 through September 20, 1999.
AFFIRMED.

. According to Wikipedia, a pars plana vitrec-tomy is a general term for a group of operations accomplished in the deeper part of the eye, all of which involve removing some or all of the vitreous — the eye’s clear internal jelly. (Wikipedia, The Free Encyclopedia, [as of February 8, 2011].)

. According to Wikipedia, intraocular pressure (IOP) is the fluid pressure of the aqueous humor inside the eye. In ophthalmology, to-nometry is the measurement eye care professionals use to determine the fluid pressure inside the eye. Current consensus among optometrists and ophthalmologists define normal intraocular pressure as that between 10 mmHg and 20 mmHg. (Wikipedia, The Free Encyclopedia, [as of February 8, 2011].)